2026 IL App (2d) 240363
No. 2-24-0363
Opinion filed July 24, 2026

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

JOSE R. SALINAS, Defendant-Appellant.

Appeal from the Circuit Court of Kane County.
Honorable Alice C. Tracy, Judge, Presiding.
No. 07-CF-671

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justice Jorgensen concurred in the judgment and opinion.
Justice Birkett concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    Defendant, Jose R. Salinas, appeals from the second-stage dismissal of a claim of actual innocence in his successive petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)). Because the record does not establish that defendant received the reasonable assistance of counsel, we reverse and remand for further proceedings.

¶ 2                              I. BACKGROUND

¶ 3    In 2007, defendant was charged with first degree murder (720 ILCS 5/9-1(a)(1) (West 2000)) in connection with the fatal shooting of Luis Donatlan in Aurora on May 8, 2000. The matter proceeded to a jury trial. There was evidence of two shootings in Aurora on May 8, 2000: one in the afternoon and one in the evening. Donatlan was killed during the afternoon shooting.

¶ 4    Keith Morin testified that, at about 2 p.m. on May 8, 2000, he was at home on Woodlawn Avenue in Aurora. At that time, he observed a red car being followed by a blue car. He saw a passenger in the blue car—a clean-shaven Hispanic male about 18 or 19 years old—firing a black gun out of the window.

¶ 5    Aaron Cohen testified that, on May 8, 2000, he was a "foot soldier" for the Ambrose street gang. At the time of trial, Cohen had convictions of residential burglary and possession of a controlled substance with intent to deliver. He testified that he had not entered into any agreements with the State for his trial testimony. He related that, on the afternoon of May 8, 2000, he was driving a blue Chevrolet Malibu on Gale Street in Aurora. Defendant was in the passenger seat. While defendant and Cohen were stopped at the intersection of Gale and Lake Street, a Buick pulled up next to them. Defendant mentioned to Cohen that someone in the Buick appeared to have a teardrop tattoo, suggesting he was a rival gang member. At defendant's request, Cohen followed the Buick along Gale. When the Buick stopped at Woodlawn, defendant pulled a gun and started shooting at the Buick. Cohen described the gun as a "black automatic."

¶ 6    On cross-examination, Cohen acknowledged that he was aware that driving the Malibu during the shooting made him responsible for murder. He acknowledged that his attorney had received a letter from the State assuring that his testimony at defendant's trial would not be used against him in future proceedings. He testified that he spoke to no one about the shooting until 2007, when officers approached him at a work-release facility and accused him of involvement in Donatlan's death. Cohen was "aware that [he was] gonna be charged with something having to do with" the shooting of Donatlan. He was not aware what he would be charged with and was "hopeful" he would not be charged at all if defendant were convicted. Cohen denied that the way

to advance beyond "foot soldier" in the Ambrose was to kill someone. Cohen denied that he ever "brag[ged] about the shooting."

¶ 7 Orlando Rivera testified that, on May 8, 2000, he was a member of the Insane Deuces street gang, which was part of an alliance of gangs known as the Folks. Before 2000, Orlando was a member of the Ambrose, which was also part of the Folks. In 2000, Orlando's cousin, David Rivera, was a member of the Ambrose. Defendant was also an Ambrose member. In spring 2000, before May 8, Orlando possessed a .40-caliber H&K handgun, which was a "nation gun," *i.e.*, a community weapon. Orlando traded the H&K handgun for David's 9-millimeter Browning handgun. Orlando had seen the 9-millimeter Browning in defendant's possession. On May 8, 2000, Orlando, having "hear[d] about a shooting that occurred on Woodlawn," spoke to defendant about the shooting. Defendant told Orlando that "he—or they shot numerous times" at a member of the Latin Kings street gang. Defendant did not say "who actually pulled the trigger." On cross-examination, Orlando admitted that he had felony convictions and was a paid informant for the federal government.

¶ 8 David Rivera confirmed that, in 2000, he was a member of the Ambrose, and his cousin Orlando was a member of the Insane Deuces. In spring 2000, one of his gang's "nation guns" was a 9-millimeter Browning handgun. That spring, before May 8, 2000, David traded the 9-millimeter handgun for Orlando's .40-caliber handgun. Before May 8, 2000, David had seen defendant in possession of the 9-millimeter handgun "[a] few times." Also, before May 8, 2000, he had seen defendant in possession of the .40-caliber handgun. On the afternoon of May 8, 2000, David was in the backyard of 595 Second Avenue, which was about four blocks from "the intersection of Clark Street and T Street." Defendant came up the driveway and "said they had shot at some people." Defendant did not say whom he was with or who had "pulled the trigger when these shots

were fired." At about 9 p.m. that evening, while at the same residence, David heard gunshots a few blocks away. Defendant came up the driveway "a little breathless" and said that "they did a shootout, and they crashed a car." Asked "who was in the group that did the shootout," David replied, "The Kings." David testified that the Latin Kings and the Ambrose were rivals. David had several felony convictions and, at the time of trial, was the subject of a criminal investigation. He was not testifying under any agreement with the Kane County State's Attorney's Office or the federal government, but when asked if he "wish[ed] *** to receive [a] benefit in exchange for [his] testimony," he answered, "Yes."

¶ 9    An Aurora police officer testified that he heard gunshots while on patrol in Aurora at about 9 p.m. on May 8, 2000. He proceeded to the T-intersection of Clark Street and Bevier Place, where he observed a blue Chevrolet Malibu that had hit a tree. The Malibu had no occupants. The State presented evidence that shell casings found at that site and at the scene of the shooting that afternoon at Gale and Woodlawn were fired from the same .40-caliber weapon.

¶ 10    Maria Liquez, the mother of defendant's children, testified that, on April 6, 2007, she and defendant's parents visited defendant in jail. Defendant asked Liquez to provide an alibi for him.

¶ 11    Sergeant Jeff Wiencek, an expert on gangs, testified that, in May 2000, defendant and Cohen were members of the Ambrose and Donatlan was a member of the Latin Kings. Cohen's gang nickname was "White Folks." Donatlan had a teardrop tattoo under his left eye.

¶ 12    After the State rested, Pedro Moreno testified for the defense that, at around 2 p.m. on May 8, 2000, he was standing on a corner outside his aunt's house on Woodlawn. Moreno was with gang members. On that date, Moreno had no gang affiliation but was previously a member of the Latin Kings. Moreno observed an individual named Aaron, known as "White Folks," fire a gun from a blue car at another vehicle. Later, at Christmastime 2000, while Moreno was in the Kane

County jail, he saw "White Folks" when they were both being taken to court. Moreno told "White Folks" that he had seen him "doing the shooting" on May 8, 2000. "White Folks" admitted that he had "killed" Donatlan. Moreno denied telling police that the car involved in the shooting was gray.

¶ 13    Fredrick Thomas testified that, in May 2000, a person he knew as "White Folks" would visit the housing complex where Thomas lived. According to Thomas, "White Folks" was mixed-race but looked Hispanic.

¶ 14    In the State's rebuttal case, the detective who interviewed Moreno testified that Moreno described the vehicle from which "White Folks" had fired as a gray Buick. The State also presented evidence that Cohen was not in custody at Christmastime in 2000, but that Moreno and Cohen were in custody in the same cell block in March 2001.

¶ 15    The jury found defendant guilty of first degree murder and further found that he personally discharged a firearm during the offense. At that time, first degree murder was ordinarily punishable by a prison term of not less than 20 and not more than 60 years. 730 ILCS 5/5-8-1(a)(1)(a) (West 2000). However, when, as in this case, the trier of fact found that the defendant personally discharged a firearm, 20 years had to be added to the defendant's prison term. *Id.* § 5-8-1(a)(1)(d)(ii). The trial court sentenced defendant to a 57-year prison term.

¶ 16    We affirmed defendant's conviction. *People v. Salinas*, No. 2-08-0728 (2010) (unpublished order under Illinois Supreme Court Rule 23).

¶ 17    On March 28, 2011, defendant filed a petition for relief under the Act. On June 22, 2011, the trial court summarily dismissed the petition. See 725 ILCS 5/122-2.1(a)(2) (West 2010). Defendant appealed, and the Office of the State Appellate Defender was appointed to represent him. However, appellate counsel moved to withdraw per *Pennsylvania v. Finley*, 481 U.S. 551 (1987), and *People v. Lee*, 251 Ill. App. 3d 63 (1993). We granted the motion and affirmed the

summary dismissal of the petition. *People v. Salinas*, No. 2-11-0697 (2013) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 18 On June 12, 2013, defendant filed a *pro se* motion for leave to file a successive postconviction petition. The proposed successive petition raised, *inter alia*, a claim of actual innocence. On June 28, 2013, the trial court granted defendant leave to file his petition and appointed the Office of the Kane County Public Defender to represent him. On July 17, 2013, defendant filed a *pro se* "addendum" to the proposed petition.

¶ 19 More than seven years later, on September 8, 2020, postconviction counsel filed an amended successive postconviction petition claiming that (1) defendant was deprived of due process of law because the State failed to disclose that Cohen had entered into an agreement with the State for his trial testimony and instead presented perjured testimony that he had not entered into such an agreement; (2) defendant was deprived of due process of law because the State did not disclose a police report concerning a possible suspect; (3) defendant was deprived of the effective assistance of trial counsel in that counsel failed to call defendant's wife, brother, and parents to impeach Liquez's testimony and failed to call Elias Diaz, an Ambrose member who would have testified that Cohen admitted to killing Donatlan; (4) defendant was deprived of the effective assistance of counsel on appeal where appellate counsel failed to challenge trial court rulings admitting certain gang evidence and barring other such evidence; and (5) the trial court failed to conduct a proper *voir dire* examination in accordance with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007). The amended successive petition also raised a claim of actual innocence.

¶ 20 The amended successive petition was accompanied by two affidavits from defendant and affidavits from Roberto Salinas (defendant's father), Daniel Salinas (defendant's brother), Cecilia Barraza (defendant's former wife), Luis Lomeli, Mark Downs, Cevin Stanford, Hector Mauricio,

and Diaz. Defendant's affidavits were executed on May 24, 2013. The other affidavits most critical to this appeal—Diaz's and Stanford's—were executed on May 31, 2012, and June 27, 2013, respectively.

¶ 21 Roberto Salinas's affidavit stated that defendant was home on May 9, 2000,[1] and that Liquez did not come with him and defendant's mother to visit defendant in jail on April 6, 2007.

¶ 22 Daniel Salinas's affidavit stated that he overheard part of a telephone conversation between Liquez and defendant while defendant was in pretrial custody. Liquez told defendant that if he did not want to leave his wife and be with Liquez and their children, Liquez would make sure defendant would never see their children again.

¶ 23 Barraza's affidavit stated that, while defendant was in pretrial custody, she asked Liquez if Liquez's children with defendant could socialize with Barraza's daughter. Liquez responded that she would make sure Barraza and defendant never saw Liquez's children again. According to the affidavit, Liquez was jealous of Barraza's relationship with defendant.

¶ 24 The affidavits from Downs and Lomeli stated that defendant was not involved in the gun exchange that was the subject of the testimony of David and Orlando Rivera.

¶ 25 Diaz's affidavit stated that, at the end of May 2000, the Ambrose had a gathering at which Cohen was introduced as a new member. Diaz asked Cohen "what he did to get in the mob." Cohen replied that "he had killed the king over in the West Side on Gale and Woodlawn." Diaz "said, 'That was you who did that,' and he answered 'yeah that was me.' " Fearing retaliation against his family, Diaz "never told any of this to anybody." Diaz further averred, "Because I was also fighting my own case at the same time [as defendant] was fighting his case, my attorney advised me not to get involved in [defendant's] case." However, Diaz could not "go on any longer knowing that an

---

[1]The shooting for which defendant was charged and convicted occurred on May 8, 2000.

- 7 -

innocent man [was] in prison for something he didn't do." Diaz believed that "the truth need[ed] to come out that [defendant] did not commit the crime he was convicted of."

¶ 26    Stanford's affidavit stated that when he returned home on the night of May 8, 2000, the police were there and arrested him. They accused him of involvement in the shooting of Donatlan that afternoon. Stanford told the police that he was not involved. He told them he was at a store when he observed a purple Malibu with a white male in the passenger seat. The Malibu appeared to be chasing another vehicle. When the Malibu got to the corner of Gale and Woodlawn, the white male started shooting at the other vehicle with a black handgun. Stanford later found out that the gunman was an Ambrose member who went by the name "White Folks." Stanford averred:

> "I didn't come forward with this information before because I was scared to be a snitch because I didn't want the Ambrose to kill me or hurt my family. I came forward with this information now because [defendant] is not the man I saw in the purple Chevy Malibu shooting that day."

¶ 27    Mauricio's affidavit stated that defendant was not involved in the shooting that occurred on the evening of May 8, 2000.[2]

¶ 28    Defendant's affidavits stated that when he filed his first postconviction petition, he was unaware of the information in Diaz's affidavit. Defendant did not learn of that information until he and Diaz were "[h]oused [t]ogether." Defendant's trial counsel, who also represented Diaz, did not advise defendant of "[t]he [s]tatements made by *** Diaz." "Nor did [counsel] consider [defendant's] opinion on having [Diaz] as a defense witness."

¶ 29    Accompanying the amended successive petition was postconviction counsel's certificate under Illinois Supreme Court Rule 651(c) (eff. July 1, 2017).

---

[2]As noted, defendant was convicted of a shooting that occurred on the *afternoon* of May 8, 2000.

- 8 -

¶ 30    The State moved to dismiss the amended successive petition. The trial court granted the motion as to each claim except defendant's claim regarding Cohen's alleged agreement to testify and the State's use of his allegedly false testimony that no agreement existed. Following an evidentiary hearing, the trial court denied that claim. Defendant filed a timely notice of appeal.[3]

¶ 31                                    II. ANALYSIS

¶ 32    Defendant argues that we should reverse the second-stage dismissal of his amended successive postconviction petition because (1) postconviction counsel's certificate under Rule 651(c) was deficient and (2) the petition sufficiently stated a claim of actual innocence.

¶ 33    We begin with a brief review of the principles governing proceedings under the Act. As we have observed:

    "The Act allows a criminal defendant to assert in a petition that 'in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both.' [Citation.] The Act provides a three-stage mechanism for a defendant to advance such a claim. [Citation.] At the first stage, the trial court independently reviews the petition and determines whether to dismiss it as frivolous or patently without merit. [Citation.] If the petition is not summarily dismissed, it advances to the second stage, where the court may appoint an indigent defendant counsel and the State may either answer or move to dismiss

_____

[3]We note that the Office of the State Appellate Defender was appointed to represent defendant. Per *Finley*, 481 U.S. 551, and *Lee*, 251 Ill. App. 3d 63, the appellate defender moved to withdraw as counsel, and defendant filed a response to the motion. We denied the motion without prejudice, ordering counsel to file either a new motion to withdraw or a brief on the merits.

the petition. [Citations.] If the petition is not dismissed, it advances to a third-stage evidentiary hearing." *People v. Marcus*, 2023 IL App (2d) 220096, ¶ 57.

¶ 34 Section 122-2 of the Act (725 ILCS 5/122-2 (West 2018)) provides, "The petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached."

¶ 35 Generally, a defendant may file only one petition under the Act. *People v. McCoy*, 2026 IL 131565, ¶ 48. However, the bar against successive petitions will be relaxed if the defendant "(1) can establish cause and prejudice for the failure to assert a postconviction claim in an earlier proceeding or (2) asserts a fundamental miscarriage of justice based on actual innocence." *Id.* "[W]here a defendant sets forth a claim of actual innocence in a successive postconviction petition, the defendant is excused from showing cause and prejudice." *People v. Ortiz*, 235 Ill. 2d 319, 330 (2009).

¶ 36 Turning to defendant's arguments on appeal, we first consider whether the proceedings complied with Rule 651(c), which governs counsel's duties in postconviction proceedings. Although there is no constitutional right to counsel in a postconviction proceeding, where the defendant is represented by counsel, the Act requires counsel to provide a reasonable level of assistance. *People v. Williams*, 2025 IL 129718, ¶ 43. To ensure that the defendant has received the requisite level of assistance, Rule 651(c) provides that the record on appeal from the denial of a postconviction petition

"shall contain a showing, which may be made by the certificate of [the defendant's] attorney, that the attorney has consulted with [the defendant] by phone, mail, electronic means or in person to ascertain his or her contentions of deprivation of constitutional rights, has examined the record of the proceedings at the trial, and has made any amendments to

the petitions filed *pro se* that are necessary for an adequate presentation of [the defendant's]

contentions." Ill. S. Ct. R. 651(c) (eff. July 1, 2017).

A facially valid Rule 651(c) certificate creates a rebuttable presumption that counsel provided

reasonable assistance. *People v. Beasley*, 2017 IL App (4th) 150291, ¶ 39. It is well established

that, "[a]lthough strict compliance is not necessary, postconviction counsel must substantially

comply with Rule 651(c)." *People v. Mason*, 2016 IL App (4th) 140517, ¶ 19. We review *de novo*

postconviction counsel's compliance with Rule 651(c). *People v. Frey*, 2024 IL 128644, ¶ 21.

¶ 37     Although postconviction counsel filed a Rule 651(c) certificate, defendant argues that the

certificate was deficient. Counsel's certificate provided as follows:

"1. On June 28, 2013, the court appointed the Kane County Public Defender's

Office to represent [defendant].

2. On December 12, 2013, the [c]ourt advanced the matter to the second stage.

3. [C]ounsel has reviewed the [p]etition filed by [defendant].

4. [C]ounsel has reviewed the records contained within the court file in 07 CF 671

and obtained and reviewed a copy of the transcripts, including trial and sentencing

transcripts, filed with the Kane County Clerk's Office.

5. [C]ounsel has consulted with [defendant] in person, by mail, and through legal

telephone calls to the extent necessary to adequately represent his contentions of error in

the proceedings and thereafter filed an [a]mended [p]ost-[c]onviction [p]etition."

¶ 38     The problem lies with the final paragraph, which conflates Rule 651(c)'s consultation

requirement with its amendment requirement. Counsel certified that he "*consulted* with

[defendant] *** to the extent necessary to adequately represent his contentions of error" (emphasis

added) and that he "*thereafter* filed an [a]mended [p]ost-[c]onviction [p]etition" (emphasis added).

However, consulting with defendant "to the extent necessary to adequately represent his contentions of error" does not necessarily mean that the amended petition counsel filed adequately presented defendant's contentions. Rule 651(c) frames the adequacy of the consultation and the adequacy of the amended petition as distinct requirements. Although Rule 651(c) does not require a particular form of language for counsel's certificate, hewing as closely as possible to the language of the rule avoids questions as to the adequacy of counsel's performance. Because doing so is not particularly burdensome, we are not inclined to interpolate missing language into a certificate that is deficient on its face.

¶ 39　　The State argues that postconviction counsel substantially complied with Rule 651(c), but the cases it cites in support of its argument—*People v. Jackson*, 2026 IL App (4th) 250215-U, and *People v. Richardson*, 382 Ill. App. 3d 248 (2008)—are distinguishable. As pertinent here, postconviction counsel's Rule 651(c) certificate in *Richardson* stated that counsel filed a supplemental postconviction petition that " 'adequately complement[ed] [the defendant's] claims of deprivation of his constitutional rights.' " *Richardson*, 382 Ill. App. 3d at 251. The court in *Richardson* concluded that this language signified that counsel complied with the requirement of making amendments necessary for an adequate presentation of the defendant's contentions. *Id.* at 257. The certificate in *Jackson* stated that counsel " 'made amendments to the *pro se* petition necessary for adequate presentation of [the defendant's] *proceedings*.' " (Emphasis added.) *Jackson*, 2026 IL App (4th) 250215-U, ¶ 12. The court found the certificate to be adequate. *Id.* ¶ 22. The court recognized that "the words 'proceedings' and 'contentions' are not synonymous." *Id.* Nonetheless, the court noted that the certificate stated that counsel had conferred with the defendant to " 'ascertain [her] *assertions* of deprivation of Constitutional rights.' " (Emphasis added.) *Id.* Thus, the substitution of "proceedings" for "contentions" could not plausibly be viewed

as intentional. The *Jackson* court also relied on *Richardson*, noting that the certificate there "contained wording that was not synonymous with the language of Rule 651(c) and [was] nevertheless found to be substantially compliant." *Id.*

¶ 40 Both *Jackson* and *Richardson* are distinguishable because the certificate in this case contains no language that could be read to mean that counsel not only consulted with defendant to ascertain his contentions but also amended the *pro se* petition to adequately present those contentions. We acknowledge that the failure of postconviction counsel to file a conforming Rule 651(c) certificate does not necessarily preclude a finding of compliance with that rule. Absent a certificate, however, the record must make a clear, affirmative showing of compliance. *People v. Woods*, 2020 IL App (1st) 162751, ¶ 99. Defendant argues that because postconviction counsel failed to shape one of his postconviction claims into its proper legal form, the record does not show compliance with Rule 651(c). The State responds that the claim was meritless in any event. The issue is purely academic, however. Even assuming that postconviction counsel's representation with respect to the claim in question conformed to the requirements of Rule 651(c), it would not follow that counsel made amendments necessary to adequately present defendant's *other contentions*. Because the State does not argue that the record sufficiently shows compliance with Rule 651(c), the absence of a proper certificate is dispositive.

¶ 41 It is well established that remand for new second-stage proceedings is required "where postconviction counsel failed to fulfill the duties of consultation, examining the record, and amendment of the *pro se* petition." *People v. Suarez*, 224 Ill. 2d 37, 47 (2007). This is true whether the underlying postconviction claims are meritorious or not. *Id.* at 52. Nonetheless, because the issue is germane to the proceedings on remand, we consider whether, as defendant argues, the trial court erred in dismissing his actual innocence claim.

¶ 42 Where, as here, the trial court grants the defendant leave to file a successive petition, "the petition advances to the second stage, where the [defendant] must make a substantial showing of actual innocence to proceed to an evidentiary hearing." *People v. Ruhl*, 2021 IL App (2d) 200402, ¶ 63. "The substantial showing required to avoid dismissal at the second stage is greater than the standard that must be satisfied to obtain leave to file a successive petition." *People v. Robinson*, 2020 IL 123849, ¶ 43. "[A]ll well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true." *Id.* ¶ 45. "In deciding the legal sufficiency of a postconviction petition, the court is precluded from making factual and credibility determinations." *Id.*

¶ 43 As our supreme court has observed:

"To succeed on a claim of actual innocence, the [defendant] must present evidence that is (1) newly discovered, (2) material and not cumulative, and (3) of such a conclusive character it would probably change the result on retrial. [Citations.] 'New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence.' [Citation.] Evidence is considered material if it is relevant and probative of the [defendant's] innocence. [Citation.] Noncumulative means the evidence adds to what was heard by the jury. [Citation.] Lastly, conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result." *McCoy*, 2026 IL 131565, ¶ 54.

¶ 44 Whether newly discovered evidence is "conclusive" hinges on whether it "places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 55. " 'Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together.' " *Id.* (quoting *People v.*

*Coleman*, 2013 IL 113307, ¶ 97). The trial court may not dismiss an actual innocence claim merely because it does not believe the new evidence is credible. *People v. Sanders*, 2016 IL 118123, ¶ 42. To the contrary, "[c]redibility determinations may be made only at a third-stage evidentiary hearing." *Id.* A second-stage dismissal under the Act is reviewed *de novo*. *Id.* ¶ 31.

¶ 45    Defendant argues that the evidence contained in the affidavits of Diaz and Stanford was sufficient to raise a claim of actual innocence. We first consider whether that evidence was newly discovered. According to the State, neither affidavit contained newly discovered evidence. The State notes that, in May 2013, "[a] year after Diaz signed his affidavit, in May 201[2], defendant averred that his attorney did not tell him of Diaz's statement, and *also did not 'consider [his] opinion on having [Diaz] as a defense witness*.' " (Emphasis in original.) However, trial counsel's failure to disclose Diaz's "statement"—*i.e.*, the evidence in his affidavit—to defendant is consistent with the evidence being newly discovered. Counsel could not disclose the evidence to defendant unless Diaz disclosed it to counsel. Diaz unequivocally stated that he "never told *** anybody" about his conversation with Cohen. According to defendant's affidavit, Diaz made his revelation when he and defendant were "[h]oused [t]ogether." We do not agree with the State that defendant's averment that trial counsel did not " '*consider [defendant's] opinion on having [Diaz] as a defense witness*' " (emphasis in original) meant that defendant and trial counsel discussed Diaz *before* trial. Rather, read in context, defendant's statement meant that trial counsel did not consider calling Diaz as a witness in proceedings after trial.

¶ 46    With respect to Stanford's affidavit, the trial court concluded that the evidence set forth therein would have been available in police reports tendered to defendant during discovery and was therefore not newly discovered. As noted, however, the well-pleaded allegations in the petition and supporting affidavits must be taken as true unless positively rebutted by the record. Stanford's

- 15 -

affidavit, executed in June 2013, averred that he was "com[ing] forward with this information now"—implying that he did not disclose the information to anyone (other than the police) before June 2013. Nothing in the record substantiates the trial court's theory that Stanford's statement to the police was disclosed to defendant. Speculation on this point is not a valid basis for dismissal of defendant's petition.

¶ 47    According to the State, defendant "acknowledges the information [in Stanford's affidavit] was available to him prior to his first post-conviction." The State provides no citation to the record in support of the assertion. In any event, the State's argument assumes, with no analysis or citation of authority, that if the information was known to defendant when he filed his first petition, it is not "newly discovered" for purposes of an actual innocence claim in a successive petition. This is not a settled point. In *People v. Wideman*, 2016 IL App (1st) 123092, ¶ 57, and *People v. Snow*, 2012 IL App (4th) 110415, ¶ 21, the courts held that evidence available at the time of an earlier postconviction proceeding is not "newly discovered." However, in a more recent decision cited by defendant, *People v. Beard*, 2023 IL App (1st) 200106, ¶ 49, the court declined to follow *Wideman* and *Snow*, holding instead that whether evidence is "newly discovered" depends simply on whether it could have been discovered before trial. The State essentially asks us to resolve this conflict in its favor but offers no argument why we should do so. Points not argued are forfeited (Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); see Ill. S. Ct. R. 612(b)(9) (eff. July 1, 2017)). Although the State contends that there is no evidence that defendant was unaware of Stanford's potential testimony before trial, it is unclear how defendant could have known about it.

¶ 48    We next consider whether the evidence in the Diaz and Stanford affidavits was material, noncumulative, and conclusive. There can be no doubt that the evidence was material, *i.e.*, relevant and probative of defendant's innocence. According to Diaz's affidavit, Cohen admitted that he

"killed" Donatlan. If true, then defendant might still be guilty of first degree murder under a theory of accountability (see 720 ILCS 5/5-2(c) (West 2000)). However, he would not be guilty of the enhanced form of first degree murder, of which he was found guilty based on Cohen's testimony that defendant fired the fatal gunshots. Stanford's statement that he observed a white male (whom he later found out was an Ambrose member named "White Folks") firing a gun from a purple Chevy Malibu was likewise material to the identity of the shooter.

¶ 49     The State insists that evidence bearing only on whether defendant was the gunman cannot be the basis for an actual innocence claim. We disagree. In *People v. Rosalez*, 2021 IL App (2d) 200086, ¶ 130, cited by defendant, we observed that

> "the essence of an actual-innocence claim is that the defendant asserts that he is 'innocent of the crime for which he has been tried, convicted, *and sentenced*.' [Citation.] Also, every defendant has the constitutional right to defend against the theory of guilt upon which he was prosecuted, convicted, *and sentenced*." (Emphases added.)

Defendant was sentenced on the theory that he personally discharged a firearm, which required the trial court to add 20 years to defendant's sentence. See 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2000). That 20-year mandatory increase was constitutionally permissible only because the jury concluded beyond a reasonable doubt that defendant personally discharged a firearm. See *Apprendi v. New Jersey*, 530 U.S. 466, 488 n.14 (2000). Thus, the theory of guilt upon which defendant was convicted and sentenced in this case depended upon proof beyond a reasonable doubt that defendant personally discharged a firearm. Defendant is entitled to predicate an actual innocence claim on evidence negating that theory, even if the evidence would not preclude a conviction of first degree murder without the sentencing enhancement.

¶ 50    Furthermore, the testimony of both witnesses would be noncumulative. "Noncumulative means the evidence adds to what the jury heard." *Coleman*, 2013 IL 113307, ¶ 96. We recognize that Diaz's testimony would have been similar to Moreno's. However, Moreno's testimony was severely impeached as to his assertion that Cohen confessed to the shooting. Diaz's testimony could not be considered cumulative of testimony that the jury almost certainly disregarded. Moreover, Diaz's eyewitness account would not be cumulative merely because it was similar to Moreno's account. See *People v. Warren*, 2016 IL App (1st) 090884-C, ¶ 81 ("Corroborative evidence is not the same as cumulative evidence.").

¶ 51    In considering whether the evidence was "conclusive," we begin with a threshold question specific to Diaz's affidavit, which recounts Cohen's admission to Diaz. We consider the purposes for which Diaz's testimony would be admissible. Presumably, Cohen's admission to Diaz, which was inconsistent with Cohen's trial testimony, would have been admissible for impeachment purposes. See, *e.g.*, *People v. Guerrero*, 2021 IL App (2d) 190364, ¶ 44 ("[W]hen a witness has previously made a statement and, at trial, testifies inconsistently with the statement, a party may introduce the witness's prior statement *** for the limited purpose of impeaching the witness's credibility").[4] Although "[m]ere impeachment evidence will typically not be of such conclusive character as to justify postconviction relief" (*People v. Harper*, 2013 IL App (1st) 102181, ¶ 49), Cohen's statement also would have been admissible as a statement against penal interest. In determining the admissibility of an individual's out-of-court statement that he or she committed

___

[4]Unless we make the dubious assumption that Cohen would have acknowledged his statement to Diaz had he been questioned about it at trial, the statement would not have been admissible as substantive evidence under section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2006) (governing admissibility of prior inconsistent statements as substantive evidence)).

the crime that the defendant is accused of, courts must determine "whether the declaration was made under circumstances that provide 'considerable assurance' of its reliability by objective indicia of trustworthiness." *People v. Bowel*, 111 Ill. 2d 58, 67 (1986) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 300-01 (1973)). In making this determination, courts consider whether "(1) the statement was made spontaneously to a close acquaintance shortly after the crime occurred; (2) the statement was corroborated by other evidence; (3) the statement was self-incriminating and against the declarant's interest; and (4) there was adequate opportunity for cross-examination of the declarant." *Id.* (citing *Chambers*, 410 U.S. at 300-01).

¶ 52    Cohen spoke to Diaz relatively soon after the crime, and his admission, while not completely spontaneous, was in response to a casual inquiry. Moreover, although Cohen and Diaz were not close acquaintances, it is fair to assume that, as fellow gang members, they shared a bond of trust that fostered candor. As for corroboration, Cohen's own testimony establishes that he participated in the shooting, and Stanford's affidavit tends to establish that defendant did not fit the gunman's appearance. Cohen's statement to Diaz was highly self-incriminating and against interest, and there was an opportunity to cross-examine Cohen. We note that the factors identified in *Bowel* and *Chambers* are not rigid requirements for admissibility (*id.*) and that, in this case, the balance tips in favor of admitting Cohen's statement as substantive evidence that he fired the gun that killed Donatlan.

¶ 53    Moreover, both the Stanford and Diaz affidavits place the trial evidence in a different light, casting doubt on the jury's verdict. We reach this conclusion by considering the evidence at trial alongside the new evidence. The State contends that the evidence against defendant was overwhelming. We disagree. It is true that evidence that defendant asked one of the witnesses to provide a false alibi tends to show consciousness of guilt. See *People v. Sanchez*, 2013 IL App (2d)

120445, ¶ 35. However, there was no physical evidence tying defendant to the shooting. Although the State presented evidence about an exchange of guns involving one of the same caliber as the gun used in the shooting, there was no evidence that that particular gun was the murder weapon.

¶ 54　There were two eyewitnesses to the shooting—Morin and Cohen—but only Cohen identified defendant as the gunman. Cohen was an admitted participant in the shooting who (1) stood to benefit by implicating someone else as the gunman and (2) hoped to avoid prosecution by testifying against defendant. His testimony was suspect. Orlando and David Rivera testified that defendant made statements implicating himself in the crime, but defendant did not indicate whether he was the gunman.[5] As noted, the theory under which defendant was convicted and sentenced required proof that defendant personally discharged a firearm. Testimony from Diaz and Stanford likely would have given rise to a reasonable doubt that defendant was involved in the shooting, let alone that he was the gunman.

¶ 55　Thus, while we must remand for new second-stage proceedings on defendant's petition, we hold that defendant is entitled to an evidentiary hearing on his actual innocence claim. Therefore, upon the filing of a valid Rule 651(c) certificate, and assuming counsel retains the actual innocence claim—by either retaining the current petition or filing an amended petition incorporating the claim—the claim must be advanced to an evidentiary hearing.

¶ 56　　　　　　　　　　　　　III. CONCLUSION

¶ 57　For the reasons stated, we reverse the judgment of the circuit court of Kane County and remand for further proceedings.

¶ 58　Reversed and remanded.

---

[5]Orlando and David were not necessarily credible witnesses. Both had felony convictions and expected to benefit from testifying against defendant.

¶ 59    JUSTICE BIRKETT, concurring in part and dissenting in part:

¶ 60    First, I believe that postconviction counsel's certificate substantially complied with Illinois Supreme Court Rule 651(c) (eff. July 1, 2017)'s requirements. The majority states that "the certificate in this case contains no language that could be read to mean that counsel not only consulted with defendant to ascertain his contentions but also amended the *pro se* petition to adequately present those contentions." *Supra* ¶ 40. The relevant language in Rule 651(c) is:

> "The record filed in that court shall contain a showing, which may be made by the certificate of petitioner's attorney, that the attorney has consulted with petitioner by phone, mail, electronic means or in person to ascertain his or her contentions of deprivation of constitutional rights, has examined the record of the proceedings at the trial, and has made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions." Ill. S. Ct. R. 651(c) (eff. July 1, 2017).

¶ 61    In this case, postconviction counsel filed two certificates pursuant to Rule 651(c). The first certificate was filed on September 9, 2020, one day after the amended postconviction petition was filed. The second certificate was filed on June 9, 2022, and referenced the State's motion to dismiss the amended postconviction petition and an amendment to the September 8, 2020, amended postconviction petition.

¶ 62    The majority quotes from the September 9, 2020, certificate. *Supra* ¶ 37. Postconviction counsel's June 9, 2022, certificate states as follows:

> "1. On June 28, 2013, the court appoint[ed] the Kane County Public Defender's Office to represent the Petitioner.
>
> 2. On December 13, 2013, the Court advanced the matter to the second stage.
>
> 3. That counsel has reviewed all filings filed by the Petitioner.

4. That counsel has reviewed the records contained within the court file in 07 CF 671 and obtained and reviewed a copy of the transcripts, including trial and sentencing transcripts, filed with the Kane County Clerk's office.

5. That counsel has consulted with the Petitioner in person, through legal calls, and by mail to the extent necessary to adequately represent his contentions of error in the proceedings and deprivation of constitutional rights, and thereafter filed an Amended Successive Post-Conviction Petition on September 8, 2020.

6. That counsel additionally filed on June [*sic*] November 19, 2021, a response to the state's motion to dismiss the amended successive post-conviction petition. And on June 9, 2022[,] counsel filed a response to the state's motion to dismiss and amendment 1 to petitioner's successive amended post-conviction petition."

In this certificate, postconviction counsel added language indicating his sufficient communications with defendant to represent any of defendant's contentions regarding a "deprivation of [his] constitutional rights." Given this addition, I believe postconviction counsel substantially complied with Rule 651(c). In the supplemental brief filed on his behalf,[6] defendant argues that a "*close view*" reveals that the language of the certificate differs in a crucial respect from the language of

---

[6]Appellate counsel originally filed a motion to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). This court ordered that counsel file either a new motion to withdraw or a brief addressing whether the trial court should have advanced defendant's actual innocence claim to the third stage and whether post-conviction counsel's Rule 651(c) certificate was sufficient. On August 27, 2025, appellate counsel filed an opening brief that did not address the Rule 651(c) issue. On December 23, 2025, we ordered appellate counsel to file a supplemental brief addressing the sufficiency of post-conviction counsel's Rule 651(c) certificate.

Rule 651(c). (Emphasis added.) Defendant argues that both of counsel's certificates fail to state that he made "any amendments to the petitions filed *pro se* that are *necessary* for an adequate presentation of petitioner's contentions." (Emphasis added.) I believe one can infer that post-conviction counsel's certificate used the term "necessary" to refer both to the duty to consult and to make "necessary" amendments, although stated awkwardly.

¶ 63 Substantial compliance with Rule 651(c) aside, the presumption of a reasonable level of assistance is rebutted by the record. Kathleen Colton represented defendant at trial and is accused in defendant's affidavit of failing to "discuss or advise" him of the statements made by Elias Diaz. Defendant stated that Ms. Colton was "representing both Eliaz Diaz and [himself] at that time" and if he was aware of Diaz's potential testimony, he would have fired Colton so that Diaz could testify on his behalf as a defense witness. Both the State and the trial court, in its order dismissing defendant's ineffective assistance claim, commented on the absence of any evidence from Colton. During argument on its motion to dismiss, the State commented:

> "If his attorney was Kathleen Colton, then he would have mentioned it to her prior to the date that his [a]ffidavit was signed which is May 31, 2012, and they can't demonstrate cause as to why it wasn't raised sooner. If it was an attorney other than Miss Colton, then there's no way Miss Colton could have known about this information and she can't be deemed ineffective for failing to call a witness of whom she was unaware; again, no [a]ffidavit from Miss Colton in terms of whether or not she was his attorney or they had the conversation."

In its order dismissing defendant's ineffective assistance of counsel claim, the trial court ruled as follows:

"In this affidavit, Mr. Diaz states that he was told by the defendant in the end of May, 2020, that he met Aaron Cohen in a park, and that Aaron told him he shot and killed the King Luis. He said he never told anybody about this because he did not want the Ambrose to do anything to him or his family. Two sentences later he stated that his attorney advised him not to get involved in defendant's case. Mr. Diaz never said in his affidavit who his attorney was that he told about Cohen's statement. In defendant's oral arguments on this matter, Mr. Tatman implied that the attorney in question was Ms. [Colton], defendant's trial attorney. However, nowhere in the affidavit of Mr. Diaz does he identify the attorney he spoke to about the matter. Since there is no affidavit of record stating the identity of the attorney in question, as well as the exact time frame he told the attorney about this information, defendant has not established cause in this matter. There is no evidence that he told Ms. [Colton] this information, or when. Since defendant has not established cause, there is no reason to discuss prejudice. Ms. [Colton] cannot be ineffective for failing to present evidence that she did not know about. The allegation of ineffective assistance of counsel as it relates to the affidavit of Elia[s] R. Diaz is dismissed, and will not advance to the third stage."

¶ 64   I recognize that the trial court's reasons for rejecting both defendant's ineffective assistance of counsel claim and his actual innocence claim may ultimately be deemed correct. However, that does not excuse post-conviction counsel's failure to adequately present defendant's claim. I have carefully reviewed the record in this case for any evidence that postconviction counsel sought an affidavit from Ms. Colton or an explanation for the absence of an affidavit. I could not find any.

¶ 65   As to any confusion whether Diaz was represented by Colton, we may take judicial notice of our own court records. Ill. R. Evid. 201(b) (eff. Jan. 1, 2011); see *May Department Stores Co.*

*v. Teamsters Union Local No. 743*, 64 Ill. 2d 153, 159 (1976). In Case No. 2-12-1056, Elias Diaz was represented by Kathleen Colton. On August 1, 2007 (the same day that Aaron Cohen testified in this case), Ms. Colton did not appear. The trial court asked Mr. Diaz if he would like the case to be held. Diaz replied, "Yeah. Her client in Ms. Goden's room, she [*sic*] told me she was supposed to come talk to me before the trial started over there." R. 253 (2-12-1056).

¶ 66     Although I agree with the majority that this case must be remanded, I disagree with remanding for a third-stage hearing without full compliance with Rule 651(c). It would be unfair to both defendant and the State to proceed to an evidentiary hearing without potentially relevant information from Ms. Colton. By their affidavits, both defendant and Diaz have waived attorney client privilege with respect to their conversation with Ms. Colton about Diaz's claim that Cohen confessed to killing Donathan. Therefore, I dissent from the majority's view that postconviction counsel's second certificate is deficient. I also dissent from the majority's directive that defendant's actual innocence claim "must be advanced to an evidentiary hearing" without first requiring compliance with Rule 651(c), as to Ms. Colton. I recognize that defendant's petition has been pending for 13 years, which I am sure frustrates defendant, his family, and the victim's family.

¶ 67     Finally, at a third-stage hearing on defendant's actual innocence claim, the State is not to be limited to the evidence presented at trial. All relevant, admissible evidence of defendant's guilt may be considered. This includes evidence that was erroneously excluded by the trial court prior to defendant's trial. The majority disagrees with the State's position that the evidence of defendant's guilt was "overwhelming." The majority notes that there was "evidence that defendant asked one of the witnesses to provide a false alibi," which "tends to show consciousness of guilt." *Supra* ¶ 53. That witness was Maria Liquez, the mother of four of defendant's children, who testified that during a jail visit with defendant on April 6, 2007, he held up notes to the glass that

separates the inmate from visitors. The notes asked that Ms. Liquez "say that [she] was with him" and provided details of what her alibi testimony would be.

¶ 68    Liquez also testified that she received instructions from defendant's mother to call his attorney. Defense counsel sought to discredit Liquez's testimony at trial with jail visitation records and by arguing that she was jealous regarding defendant's marriage to Cecilia Salinas. During closing argument, defense counsel argued that "[y]ou don't have anybody that can prove that she was there." Defense counsel also asked the jury to consider Liquez's motivation.

¶ 69    Prior to trial, the State sought to admit a letter dated April 3, 2007, from defendant to his wife, Cecilia. According to the State in its response to defendant's second motion to disqualify, defendant wrote:

> "Babe, [D]on't be mad or start thinking anything stupid but [Maria Liquez] is gonna come see me on *Thursday*. Nothing is going on [s]he has a boyfriend [h]e gave her permission to come see me. But I need to see her but I can't tell you in this letter why because they read this letter before sending it out ***."

¶ 70    In its motion *in limine* to disqualify Cecilia Salinas from testifying, the defense argued that the April 4, 2007, letter and "recorded telephone conversations between the Defendant and his wife" were "covered by marital privilege." In its response to defendant's motion, the State argued that defendant's own words "evince[ ] his knowledge of the lack of any privacy he has in his correspondence." The State also cited the Kane County Corrections Center Inmate Orientation Manual that warns inmates that "[a]ll incoming and outgoing correspondence is subject to examination for contraband."

¶ 71    During the hearing on the motion, defense counsel argued that the letter was covered by marital privilege. Counsel noted that the inmate orientation manual "does not say anywhere in

there that these letters are to be read by anyone at the jail." Counsel also argued that the letters that were turned over by the State were copies. The trial court asked defense counsel about defendant's statement, "But I need to see her but I can't tell you in this letter why because they read this letter before sending it out." Defense counsel argued that she did not believe it was "a waiver of privacy" because it was "intended to be a communication between the defendant and his spouse." The State argued that "there is no confidential communication coming from the jail. Especially this letter. And especially his own words." The State also assured the trial court that it would be able to lay a foundation for admission and made a proffer, stating that defendant and a few other inmates were being monitored and their letters were being copied before going out. The State explained that it was not aware of this until after trial began and immediately told defense counsel about the letter. Defense counsel, at the trial court's suggestion, made an oral motion to suppress the letter. The trial court noted that a motion to suppress can be heard during trial outside the presence of the jury.

¶ 72    Hugh O'Connor, a civilian employee of the Kane County Sheriff's Department, testified that one of his duties is to monitor certain inmate communications. O'Connor stated that a list of inmates was created through the "West Suburban Violence Street Gang Task Force, through the FBI, or other agencies." Mr. O'Connor said that he copied the letters and if there is anything "pertinent" in one he would "keep it in a file." He did not share any of those documents with the Kane County State's Attorney's Office, but only with police departments and the FBI. He copied four or five of defendant's outgoing letters in April 2007. He contacted the State's Attorney the previous Friday, July 27, 2007. He was called by the State's Attorney's Office "in regards [*sic*] to phone calls." O'Connor explained that he also copies phone calls and listens to the recordings of in-person visits if he has the time. He did not recall monitoring any of defendant's visits.

¶ 73    On cross-examination, O'Connor said he believed inmates are aware that their mail is "inspected for contraband and such." O'Connor testified that he believed defendant knew he was being monitored because "[h]e had written it down in a letter that he had sent out." O'Connor identified the State's exhibit No. 53, the letter from defendant to his wife about Maria Liquez's planned visit.

¶ 74    On redirect examination, O'Connor acknowledged that the manual says "incoming and outgoing mail is subject to examination for contraband," not "that the mail will be read." Defense counsel argued "without case law" that the search and seizure violated the Fourth Amendment. Counsel argued it was illegal, stating that "[y]ou don't give up your right to remain silent when you're an inmate in an institution."

¶ 75    The State responded that defendant knew "that his letters would be monitored, by his own words" and "[t]here is no expectation of privacy." Therefore "there was no unreasonable search and seizure while the defendant was in jail. Under any kind of reasonable standard, the motion should be denied." The defense declined to respond.

¶ 76    The trial court ruled as follows:

"The issue in this motion is whether the search and seizure here is a reasonable one. While there may be reasons that this was reasonable, I have not heard them in this motion.

Because what I have heard is that a deputy has been assigned to do something, I don't know the reason for it. I could understand why there might be reasons for it, but the regulations do not indicate that the letters would be reviewed or copied. And although—so this is really—the first prong here is whether there was reason to look at them and copy them.

- 28 -

And this is a State action done by the deputy here. And based on what I've heard this afternoon, I can't find that it's reasonable, even when I put with it the fact that apparently the second prong would be the issue of marital privilege and whether he has any expectation of privacy.

But I don't get to that because—at this point because from what I have seen in this brief hearing, I can't find that the letters should have been copied."

¶ 77 While there is a presumption that interpersonal communications between spouses are intended to be confidential, "[i]f it appears from the circumstances that confidentiality was not intended, the communication will not be regarded as privileged." *People v. Murphy*, 241 Ill. App. 3d 918, 924 (1992); *People v. Layne*, 286 Ill. App. 3d 981, 990 (1997); *People v. Gliniewicz*, 2018 IL App (2d) 170490, ¶¶ 36-37. As the State argued, defendant knew "by his own words" that his mail was being read. Our supreme court has stated the following when describing the elements for the privilege over marital communications:

"First, the communication must be an utterance or other expression intended to convey a message. Second, the message must be intended by the communicating spouse to be confidential in that it was conveyed in reliance on the confidence of the marital relationship." *People v. Trzeciak*, 2013 IL 114491, ¶ 44.

The burden of establishing that a privilege applies is on the party claiming the privilege. *Gliniewicz*, 2018 IL App (2d) 170490, ¶ 34. While defendant's letter to Cecelia regarding Maria's (Mickey's) visit was not made in the presence of a third person, defendant was clearly aware that his letters were being read before they were sent out. Defendant's argument that marital privilege applies because the letter was "intended to be a communication between the defendant and his

spouse" is without merit. Defendant's words established that he did not intend his letter to be confidential.

¶ 78 The trial court stated "that it could understand why there might be reasons" for monitoring defendant's mail "but the regulations do not indicate that the letters would be reviewed or copied." That is not a proper basis to suppress evidence. First, the burden at a motion to suppress evidence is on the defendant. Defendant failed to establish that he had a legitimate expectation of privacy in outgoing mail that he knew was being read, notwithstanding any administrative guidelines. It is a fundamental principle that inmates in penal institutions have limited rights to privacy. *Hudson v. Palmer*, 468 U.S. 517, 528 (1984).

> "A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. *** We believe that it is accepted by our society that '[l]oss of freedom of choice and privacy are inherent incidents of confinement.' " *Id.* at 527-28 (quoting *Bell v. Wolfish*, 441 U.S. 520, 537 (1979)).

> "We conclude that the rationale of *Hudson v. Palmer* is equally applicable to the instant case. The sending of mail that plots to introduce contraband into the prison subverts the same governmental interests that are protected by *Hudson*. The inspection and opening of mail is of obvious utility in protecting those interests. The warrantless search, therefore, was valid." *State v. Dunn*, 478 So. 2d 659, 663 (La. Ct. App. 1985).

¶ 79 Our review is *de novo*. Any evaluation as to whether Diaz's or Stanford's proposed testimony would be of such "conclusive character that it would probably change the result on retrial" should be considered in light of the relevant and admissible evidence for both defendant and the State. *People v. Robinson*, 2020 IL 123849, ¶ 47. As our supreme court stated in *Robinson*,

"[t]he conclusive character of the new evidence is the most important element of an actual innocence claim." *Id.* The trial court characterized defendant's motion as a "motion to suppress." The motion filed by defendant was a motion *in limine* that may be reconsidered at any time before or during trial. *People v. Bennett*, 329 Ill. App. 3d 502, 515 (2002).

¶ 80    At a third-stage evidentiary hearing on an actual innocence claim, "the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *People v. Coleman*, 2013 IL 113307, ¶ 97. During a third-stage hearing, the trial court considers a "petitioner's new evidence, along with the evidence presented at the original proceedings as well as any new evidence presented by the State." *People v. Harris*, 2025 IL 130351, ¶ 41.

¶ 81    Prior to trial, defendant filed his "Motion in *Limine* IV," seeking to bar the testimony of Maria Liquez. At the hearing, defense counsel argued that there was "no record of Maria Liquez ever visiting" defendant. Counsel stated, "[T]here is absolutely no corroboration to this statement that she gives to the police." Defense counsel argued that the defense was not asserting an alibi, Liquez's testimony was "very speculative," and "there is motivation." Defense counsel stated that, if Liquez was allowed to testify, it would place her in the position of "having to call the [d]efendant's mother, the [d]efendant's father" to testify that there "never was such a visit."

¶ 82    On July 17, 2007, the trial court denied defendant's motion based on the State's proffer that it would show "consciousness of guilt." In defendant's *pro se* successive petition, and postconviction counsel's amended successive petition, defendant argues that trial counsel was ineffective for failing to call either Dominga or Roberto Salinas (defendant's parents) to testify that "at no time did they take Maria Liquez to the Kane County Jail to visit the Petitioner." The trial court dismissed this claim based on defendant's failure to establish cause and the principle

that the decision to call a particular witness is generally a matter of trial strategy. Defendant's letter to Cecelia Salinas, dated April 3, 2007, fully explains why counsel could not call either Dominga or Roberto Salinas. See Model Rules of Pro. Conduct R. 3.3(a)(3) (Am. Bar. Ass'n 1983) ("A lawyer shall not knowingly: *** (3) offer evidence that the lawyer knows to be false.").

¶ 83    For the above-stated reasons, I agree that this case must be remanded for second-stage review because the record rebuts the presumption that postconviction counsel provided a reasonable level of assistance. I disagree with the majority that defendant's actual innocence claim must be advanced to an evidentiary hearing. That decision should be made by the trial court after full compliance with Rule 651(c).

*People v. Salinas*, 2026 IL App (2d) 240363

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 07-CF-671; the Hon. Alice C. Tracy, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Christopher McCoy, and Zachary Wallace, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Stephanie Hoit Lee, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |